UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| BILLI-JO CLUNEY, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVE FOR THE ESTATE OF JAMES M. CLUNEY, SR., <br><br>Plaintiffs, <br><br>v. <br><br>BROWNELLS, INC., and MDX CORP., and FEDEX CORPORATE SERVICES, INC., <br><br>Defendants. | Case No. 1:24-cv-00207-LEW |

### DEFENDANT MDX CORP.'S MOTION TO DISMISS COMPLAINT WITH INCORPORATED MEMORANDUM OF LAW

Defendant MDX Corp. ("MDX"), by and through undersigned counsel, and pursuant to Federal Rules of Civil Procedure 12(b)(6), moves to dismiss the Plaintiff's Complaint ("Complaint") as to MDX on the grounds that Plaintiff fails to state a claim upon which relief can be granted.

### INTRODUCTION

This lawsuit stems from the criminal shooting of James Cluney, Sr. by Atilio Delgado ("Delgado") on May 6, 2022. It is alleged that Delgado built his own firearm from parts purchased from MDX which he eventually used in the shooting. Plaintiff, the Personal Representative of Mr. Cluney's Estate, brought this action against MDX (and others) alleging claims of negligence based on the unlawful sale of a firearm and ammunition under federal law and the laws of Maine. However, MDX did not sell a firearm as defined by Federal law and the laws of the State of Maine to Delgado nor did it sell him any ammunition. As alleged, MDX only sold firearms components which have no sales restrictions under state or federal law. As such Plaintiff's negligence claims,

all of which are premised on the unlawful sale of a firearm and/or ammunition must be dismissed against MDX. Moreover, even if the negligence claims were proper as pled, MDX did not owe or breach any duty to Mr. Cluney and Delgado's criminal actions were a sole proximate and a superseding cause of Plaintiff's death breaking any potential chain of causation. As such, Plaintiff's Complaint against MDX should be dismissed.

## FACTUAL BACKGROUND

It is alleged that on or around October 10, 2021, Delgado, then sixteen (16) years old, purchased an unfinished (80%) frame and other firearm components using a Visa gift card from MDX. (Dkt. No. 1-1, Complaint at ¶ 95) (Ex. A, MDX Receipt.)[1] Delgado did not purchase a finished handgun frame, a firearm, or any ammunition from MDX. (Id.) Between November 10, 2021 and December 18, 2021, Delgado purchased additional handgun accessories and/or ammunition from Defendant Brownell's, Inc. ("Brownell's"). (Dkt. No. 1-1, Complaint at ¶¶ 96-99.) Using the firearm components purchased from MDX and potentially also from Brownell's, Delgado allegedly finished the 80% frame into a functioning frame and built a handgun. (Id. at ¶ 100.). On May 6, 2022, Delgado used the handgun he built himself to shoot and kill James Cluney, Sr. (Id. at ¶¶ 90-93, 113-117.) As a result, Delgado was charged with intentional or knowing murder. (Id. at 117.)

---

[1] This Court can review and consider the sales documents without converting this to a motion for summary judgment because the sales receipt is integral to the alleged sale by MDX, and the allegations in the Complaint related to the sale by MDX, including the sales date, amount paid, and credit card used, are dependent on the actual sales documents. See Diva's Inc. v. City of Bangor, 411 F.3d 30, 38 (1st Cir. 2005); Nat. Res. Council of Me. v. Int'l Paper Co., 424 F.Supp.2d 235, 246–47 (D. Me. 2006) ("The exception does not require that the document be expressly incorporated in the complaint. It only requires that the document be 'sufficiently referred to in the complaint.'") (quoting Alt. Energy, Inc. v. St. Paul Fire & Marine Ins. Co., 267 F.3d 30, 33 (1st Cir. 2001)); James D. Julia, Inc. v. Dan Morphy Auctions, LLC, 2021 WL 2535941, at *8 (D. Me. June 21, 2021) ("The Court concludes that it may properly consider the attachments to [defendant's] motion when ruling on the motion to dismiss because overcoming the parol evidence rule is essential to [plaintiff's] claims.").

Subsequently, Plaintiff Billi-Jo Cluney, James Cluney, Sr.'s wife, brought the subject lawsuit against MDX alleging that MDX violated Federal Laws, 18 U.S.C. §921–923, and Maine Laws, 17-A M.R.S.A. §554-B and 15 M.R.S.A. §394, by selling a "firearm" to Delgado. (Id. at ¶¶ 30-75.)  Plaintiff asserted multiple claims for negligence against MDX all premised on the unlawful sale of a firearm. (Id. at Counts VII [Negligence]; VIII [Wrongful Death]; IX [Wrongful Death – Conscious Pain and Suffering]; X [Loss of Consortium]; XI [Punitive Damages]; and XII [Punitive Damages – Wrongful Death]). However, Plaintiff's claims against MDX should be dismissed because it did not violate Federal Laws, 18 U.S.C. §921-923, or the laws of Maine, 17-A M.R.S.A. §554-B and 15 M.R.S.A. §394, by selling an unfinished frame, which is not a firearm, and other firearms components the sale of which were not federally regulated or regulated in Maine at the time of the subject sale.

## **LEGAL STANDARD**

Under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain factual allegations sufficient to "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quotations omitted).  In ruling on a motion to dismiss, the Court "must accept as true the well-pleaded factual allegations of the complaint, draw all reasonable inferences therefrom in the plaintiff's favor, and determine whether the complaint, so read, limns facts sufficient to justify recovery on any cognizable theory." Rivera v. Centro Medico de Turabo, Inc., 575 F.3d 10, 15 (1st Cir. 2009) (citing LaChapelle v. Berkshire Life Ins. Co., 142 F.3d 507, 508 (1st Cir. 1998)). The factual allegations in the complaint "must be enough to raise a right to relief above the speculative level" and must assert more than a "possibility" of relief and instead demonstrate that entitlement to relief is "plausible." Bell Atl. Corp. v. Twombly, 550 U.S. 554, 554–57 (2007). "Threadbare recitals of the elements of a cause of action, supported by mere

conclusory statements, do not suffice." Iqbal, 556 U.S. at 678. "Determining whether a complaint states a plausible claim for relief will . . . be a context specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. at 679.

## LEGAL ARGUMENT

**I. MDX DID NOT VIOLATE ANY FEDERAL OR STATE LAW BY SELLING AN UNFINISHED FRAME TO ATILIO DELGADO.**

**A. Plaintiff's Allegations that MDX Violated Federal Law Fail Because the Product at Issue is Not a "Firearm" as Defined by Federal Laws 18 U.S.C. §921-923 and Maine Laws 17-A M.R.S.A. §554-B and 15 M.R.S.A. §394.**

Plaintiff claims that MDX is negligent for violating Federal and State law by selling a "firearm" to sixteen (16) year old minor Atilio Delgado. Federal and Maine law makes it illegal to sell firearms under multiple circumstances. See 18 U.S.C. §921-923 and 17-A M.R.S.A. §554-B and 15 M.R.S.A. §394. The sale of incomplete (80%) firearms frames and individual components or parts kits are not included under these laws. See e.g., Fahr v. City of San Diego, 2021 WL 4895974, at *1 (S.D. Cal. Oct. 20, 2021).[2]

---

[2] Quoting from Fahr:

> However, the ATF narrowly defines the terms 'frames' and 'receivers'—a definition that it currently is seeking to change—as firearm components that are readily operational without any additional modification. See 27 C.F.R. §§ 478.11, 479.11. Consequently, the ATF's definition and, thus, its serialization system, do not extend to incomplete frames and receivers which require some degree of physical alteration. Definition of "Frame or Receiver" and Identification of Firearms, 86 Fed. Reg. 27720–01 (2021) (proposed) (acknowledging incomplete frames and receivers do not meet technical definition and proposing rule change). Thus, individuals have found ways to obtain non-serialized firearms despite the ATF's regulations by 'purchasing firearm parts kits with incomplete frames or receivers, commonly called '80% receivers,' either directly from manufacturers of the kits or retailers, without background checks or recordkeeping.' … These non-serialized firearms and their component parts are known colloquially as "ghost guns" and "ghost gun kits," respectively.

Id. at *1.

### *i. An Unfinished Frame is Not a Firearm Under Federal Law*

Plaintiff's sole liability theory that MDX sold a "firearm" and is therefore negligent is incorrect because an unfinished frame is not a firearm as defined under The Gun Control Act or under the laws of Maine. Under the Gun Control Act, a "firearm" is defined to mean "(A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive;" or "(B) the frame or receiver of any such weapon." 18 U.S.C. §§ 921(a)(3)(A) and (B). Unfinished frames and receivers do not fit into either subpart of that definition.

Section 921(a)(3)(A) states that a "firearm" includes three types of "weapons": (1) a weapon that "will . . . expel a projectile by the action of an explosive"; (2) a weapon that is "designed to . . . expel a projectile by the action of an explosive"; and (3) a weapon that "may readily be converted to expel a projectile by the action of an explosive." This portion of the statutory definition of "firearm" does not apply to the unfinished frames and receivers for numerous reasons.

First, the Court should reject any argument that would categorize an incomplete frame of a weapon as a firearm under subsection (A) because such an interpretation would make subsection (B) wholly superfluous. See Lopez-Soto v. Hawayek, 175 F.3d 170, 173 (1st Cir. 1999); United States v. Harris, 838 F.3d 98, 106 (2d Cir. 2016); Corley v. U.S., 556 U.S. 303, 314 (2009). Where parties offer two competing interpretations of a statute, the rule against superfluities "favors that interpretation which avoids surplusage" and redundancies. Freeman v. Quicken Loans, Inc., 566 U.S. 624, 635 (2012) (emphasis omitted). Interpreting subsection (A) to encompass frames and receivers as well as their precursors would make the items covered by subsection (B) a mere subset of items already included in subsection (A). The Court should reject any interpretation of this statute that would make subsection (B) meaningless surplusage.

Second, interpreting subsection (A) to apply to unfinished frames and receivers would violate the "commonplace of statutory construction that the specific governs the general." RadLAX Gateway Hotel, LLC v. Amalgamated Bank, 566 U.S. 639, 645 (2012). In subsection (B) of the definition, Congress specifically spoke to the status of a "frame or receiver," and in resolving this dispute the Court must therefore be guided by subsection (B) rather than the more general language of subsection (A).

Third, subsection (A) does not apply to the unfinished frame identified by Plaintiff because unfinished handgun frames are not themselves "weapon[s]." A "weapon" is "[a]n instrument of offensive or defensive combat" or "anything used, or designed to be used, in destroying, defeating, or injuring, an enemy, as a gun, a sword, a shield, etc." Weapon, WEBSTER'S NEW INTERNATIONAL DICTIONARY (2d ed. 1944) [hereinafter WEBSTER'S SECOND]. An unfinished frame—essentially a hunk of plastic or metal—does not satisfy this definition. It is neither an instrument of offensive combat nor something used or designed to be used in injuring an enemy. While it eventually can become part of a weapon once it is finished, it is clear from context that subsection (A) does not sweep so broadly, particularly given the separate identification of frames and receivers as "firearms" in subsection (B).

Fourth, even if the Court disagrees with these initial points, the unfinished frame still does not qualify as "firearm[s]" under subsection (A) because it "will" not, is not "designed to," and may not "readily be converted to expel a projectile by the action of an explosive." Unfinished frames are not in a state of completion that would allow the firing of a projectile, so it plainly cannot be said that they "will" expel projectiles. Nor are unfinished frames "designed to" expel projectiles because the purpose of an unfinished frame is not to expel a projectile. Instead, its purpose is to be incorporated into something else that is designed to expel a projectile. The object

that is designed to expel a projectile is the completed firearm—not its trigger, its hammer or striker, the barrel, the grip, or the frame. It is the combination of these objects into one that results in an item that is "designed to" expel a projectile. Interpreting the statute otherwise would have no limiting principle and would mean that every part of a gun—including the various screws and springs—is "designed" to expel a projectile and, therefore, would be deemed a "firearm" under subsection (A)—an absurd conclusion that cannot possibly be correct.

The unfinished frame at issue also does not qualify as "firearm" under 18 U.S.C. § 921(a)(3)(B), which covers "the frame or receiver of any such weapon" because additional steps are needed to be performed to convert an unfinished frame into a finished frame capable of being added into something that will expel a projectile by the action of an explosive as required by the Gun Control Act. Moreover, an unfinished frame cannot satisfy Section 921(a)(3)(B) on the theory that it "may readily be converted" into "the frame or receiver of any such weapon." The phrase "may readily be converted" in Section 921(a)(3)(A) cannot be imported into subsection (B), where it does not appear. Congress had the power to insert the "readily converted" language into subsection (B) but chose not to do so. Accordingly, reading this language in one subpart of the definition into another would violate the principle that "[w]hen Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." Allison Engine Co. v. U.S. ex rel. Sanders, 553 U.S. 662, 671 (2008).

Indeed, this is also the interpretation that the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") historically has adopted; it has asserted that the "readily be converted" language in subsection (A) has no application to subsection (B). ATF recently said in federal court filings that "ATF's position is that the 'readily be converted' language modifies only 'weapon' in

Section 921(a)(3)(A) and not 'frame or receiver' in Section 921(a)(3)(B)." Reply Mem. of Law in Further Supp. of Defs.' Mot. for Summ. J. at 6–7 & n.3, City of Syracuse v. ATF, No. 20-cv-6885 (S.D.N.Y. Mar. 19, 2021). ATF has also recognized that "the 'designed to' and 'readily be converted' language are only present in the first clause of the statutory definition [of firearm in Section 921(a)(3)]." Id. at 14. Thus, an unfinished frame cannot be considered a firearm under Federal law and MDX did not violate any Federal law by selling Delgado an unfinished frame.

### ii. Plaintiff's Litigating Position on the Meaning of "Firearm" Is Contrary to Longstanding ATF Guidance.

As briefly mentioned above, MDX's interpretation of the word "firearm" in § 921(a)(3) is consistent with the longstanding position of ATF. The ATF has historically focused on "the degree of machining a device has undergone" to determine whether the device is a firearm. See Fed. Defs'. Mem. of Law in Supp. of Mot. for Summ. J. at 7, Syracuse v. ATF, No. 1:20-cv-06885 (S.D.N.Y. Jan. 29, 2021). By applying that framework, the ATF determined unfinished frames and receivers that have not yet reached a critical stage of manufacturing are not firearms. (See Ex. B, Letter from Michael R. Curtis, Chief, Firearms Tech. Indus. Serv. Branch, ATF, to Jason David, The Law Offices of Davis & Assocs., at 4 (Jan. 18, 2017) [3].)

The Court should give great weight to ATF's longstanding refusal to interpret the statute in the manner the Plaintiff advocates in view of the significant reliance interests that built up around ATF's interpretation. Hilton v. S.C. Pub. Rys. Comm'n, 502 U.S. 197, 202 (1991). MDX and the gun industry more generally have spent years assiduously following ATF's guidance on this issue. Gun industry members should be encouraged to comply with ATF's guidance, not

---

[3] Per ATF's publicly available handbook posted on its website, ATF classification letters may be "relied upon by their recipients as the agency's official position concerning the status of the firearms under Federal firearms laws." NATIONAL FIREARMS ACT HANDBOOK § 7.2.4.1, ATF (Apr. 2009), https://bit.ly/3L7iHj9 (emphasis added). The Court may thus take judicial notice of this handbook and the classification letter. See e.g., Cangemi v. U.S., 13 F.4th 115, 124 (2nd Cir. 2021).

retroactively punished for doing so. ATF's longstanding interpretation also deserves additional weight because the federal statute at issue here can trigger not only civil but also criminal liability. Cf. Cargill v. Garland, 57 F.4th 447, 470–71 (5th Cir. 2023) (en banc) (applying the rule of lenity to federal definition of "machinegun"). MDX should not be punished for adhering to ATF's guidance regarding unfinished frames and receivers.

As referenced in Plaintiff's Complaint, ATF recently promulgated a new rule on August 24, 2022 addressing unfinished frames and receivers that in some respects differs from the agency's prior longstanding position. Under the new regulations, the terms "frame" and "receiver" include "a partially complete . . . or nonfunctional frame or receiver . . . that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a frame or receiver." 27 C.F.R. § 478.12(c). ATF's new rule, *which has been overturned* by the Fifth Circuit, even if applicable, does not undermine the argument that MDX's unfinished frame is not a firearm because MDX sold the subject unfinished frame to Delgado prior to the August 24, 2022 effective date of ATF's new rule. VanDerStok v. Garland, 86 F.4th 179, 182 (5th Cir. 2023), cert. granted, No. 23-852, 2024 WL 1706014 (U.S. Apr. 22, 2024).

Indeed, for about half a century, until 2022 the ATF's definition for "frame or receiver" prevailed which was that a "frame or receiver" is "[t]hat part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel." Internal Rev. Serv., Dep't of the Treasury, 33 Fed. Reg. 18,555, 18,558 (Dec.14, 1968) (to be codified at 26 C.F.R. pt. 178).[4] In August 2022, however, ATF expanded its definition to "include a partially complete, disassembled, or nonfunctional frame

---

[4] The Attorney General has delegated to the ATF the power "to administer, enforce, and exercise the functions and powers of the Attorney General" under the Gun Control Act. Gun Owners of Am., Inc. v. Garland, 19 F.4th 890, 897 (6th Cir. 2021).

or receiver, including a frame or receiver parts kit, that is designed to or may readily be completed, assembled, restored, or otherwise converted to function as a . . . receiver[.]" 27 C.F.R. § 478.12(c). ATF's new definition was promptly challenged as exceeding ATF's authority and the plain text of the GCA. A district court, analyzing whether ATF's expansion to include unfinished frames or receivers as "firearms" could be reconciled with the statutory text, enjoined the new rule. VanDerStok v. Garland, 625 F. Supp. 3d 570, 578 (N.D. Tex. 2022), op. clarified, No. 4:22-CV-00691-O, 2022 WL 6081194 (N.D. Tex. Sept. 26, 2022) ("The Final Rule's redefinition of 'frame or receiver' conflicts with the statute's plain meaning."). The district court explained:

> The definition of "firearm" in the Gun Control Act does not cover all firearm parts. It covers specifically "the frame or receiver of any such weapon" that Congress defined as a firearm. That which may become a receiver is not itself a receiver. Congress could have included firearm parts that 'may readily be converted' to frames or receivers, as it did with "weapons" that "may readily be converted" to fire a projectile. But it omitted that language when talking about frames and receivers.

Id. (internal citation omitted).

The Fifth Circuit agreed, analyzing the GCA's text and holding that ATF's effort to define unfinished frames or receivers and unfinished parts kits as "firearms" cannot be squared with the statute's text. VanDerStok, 86 F.4th at 182, 190 ("Because it clearly conflicts with the plain language of the GCA, the challenged portion of the Final Rule that redefines 'frame or receiver' to include partially complete, disassembled, or nonfunctional frames or receivers constitutes unlawful agency action."). The Final Rule took effect on August 24, 2022, 87 Fed. Reg. at 24652, and ATF explicitly declined to make the rule apply retroactively before that date, id. at 24748. All the alleged conduct by MDX took place before the Rule's effective date.[5]

---

[5] The Supreme Court, on the urging of both parties, has recently granted certiorari in VanDerStok. See No. 23-852, 2024 WL 1706014 (U.S. Apr. 22, 2024).

### *iii. An Unfinished Frame is Not a Firearm Under the Laws of Maine*

MDX's unfinished frame is even more clearly not a firearm under Maine law. Under Maine law, a firearm is defined as

> any weapon, whether loaded or unloaded, which is designed to expel a projectile by the action of an explosive and includes any such weapon commonly referred to as a pistol, revolver, rifle, gun, machine gun, or shotgun. Any weapon which can be made into a firearm by the insertion of a firing pin, or other similar thing, or by repair, is a firearm.

17-A M.R.S.A. §2 Section 12-A. Here, MDX's unfinished frame cannot expel a projectile by the action of an explosive and requires more than simply inserting a firing pin to be able to expel such a projectile. Additionally, in 2019, the Maine Legislature attempted to enact An Act To Prohibit Untraceable and Undetectable Firearms ("25 M.R.S.A §§2015 to 2017"), which would have specifically made it illegal to sell unfinished frames or receivers under certain circumstances, which was rejected. (See 25 M.R.S.A §§2015 to 2017.) The rejection of 25 M.R.S.A §§2015 to 2017 by the Legislature, indicates that the Maine Legislature does not intend for "firearm" as defined under 17-A M.R.S.A. §2 Section 12-A to include unfinished frames or receivers. Therefore, an unfinished frame cannot be considered a firearm under Maine law and as a result, MDX did not violate any Maine law by selling Delgado an unfinished frame.

## II. MDX DID NOT OWE OR BREACH ANY DUTY TO JAMES CLUNEY, SR.

To state a claim for negligence, the plaintiff must establish the following elements: "a duty owed, a breach of that duty, and an injury . . . that is proximately caused by a breach of that duty." Belyea v. Shiretown Motor Inn, LP, 2010 ME 75, ¶ 6, 2 A.3d 276, 278 (quoting Stanton v. Univ. of Me. Sys., 2001 ME 96, ¶ 7, 773 A.2d 1045, 1049). Duty is a question of law. Brown v. Delta Tau Delta, 2015 ME 75, ¶ 9, 118 A.3d 789, 791 ("Even though the issue is fact driven, the question of duty is a legal question decided by the court, not the jury"). "Duty involves the question of whether the defendant is under any obligation for the benefit of the particular plaintiff." Davis v.

- 11 -

Dionne, 2011 ME 90, ¶ 10, 26 A.3d 801, 805 (quoting Jackson v. Tedd-Lait Post No. 75, Am. Legion, 1999 ME 26, ¶ 7, 723 A.2d 1220, 1221). Absent a "special relationship," a defendant has no duty to prevent harm to another, caused by a third party. Belyea, 2010 ME 75, ¶ 9 ("[A]bsent a special relationship, the law imposes no duty to act affirmatively to protect someone from danger unless the dangerous situation was created by the defendant."). The Maine Supreme Judicial Court has expressly rejected the "pure foreseeability" view of harm to create a duty. Cameron v. Pepin, 610 A.2d 279, 284 (Me. 1992)). Thus, foreseeability of possible injury alone is insufficient to establish a duty. Baker v. Goodman, 442 F.Supp.3d 366, 375-76 (D. Me. 2020).[6]

A "special relation" in Maine "is limited to four kinds of relationships: (1) common carriers and their passengers; (2) innkeepers and their guests; (3) possessors of land and members of the public who are their invitees; and (4) those who are required by law to take physical custody of another or who voluntarily do so, 'such as to deprive the other of his normal opportunities for protection.'" Dragomir v. Spring Harbor Hosp., 2009 ME 51, ¶ 18, 970 A.2d 310 (quoting Restatement (Second) of Torts § 314A (Am. Law Inst. 1965)) (Restatement Torts).

Here, there is no special relationship between MDX and James Cluney, Sr. In fact, there is no relationship at all between the two parties. Thus, MDX had no duty to prevent his criminal killing by a third party. As such, Plaintiff cannot establish a duty or breach by MDX in this matter.

### III. MDX'S ACTIONS ARE NOT A PROXIMATE OR LEGAL CAUSE OF JAMES CLUNEY, SR.'S DEATH.

In Maine, as elsewhere, a prima facie case of negligence requires a plaintiff to establish that defendant's actions were the proximate or legal cause of a plaintiff's injuries. Clement v. U.S.,

---

[6] In Baker, the District of Maine refused to find the existence of a special relationship or a duty owed by a pawn shop who sold a BB gun to an alleged noticeably intoxicated person who was suffering from a mental breakdown when he was later shot and killed by police while in possession of the BB gun in the pawn shop parking lot. Id. at 368. The reasoning of Baker, can and should be extended to the present matter related to the lawful sale of unregulated firearm components.

980 F.2d 48, 53 (1st Cir. 1992).  In order to be a proximate or legal cause of another's harm, it is not enough that the harm would not have occurred had the actor not been negligent, the negligence must also be a "substantial factor in bringing about the harm."  Delta Air Lines, Inc. v. U.S., 561 F.2d 381, 394 (1st Cir. 1977).

> In this regard, [t]he word "substantial" is used to denote the fact that the defendant's conduct has such an effect in producing the harm as to lead reasonable men to regard it as a cause, using that word in the popular sense, in which there always lurks the idea of responsibility, rather than in the so-called "philosophic sense", which includes every one of the great number of events without which any happening would not have occurred. Each of these events is a cause in the so-called "philosophic sense", yet the effect of many of them is so insignificant that no ordinary mind would think of them as causes.

Id.

In this case, MDX lawfully sold an unfinished frame in conformity with all applicable laws. The fact that lawful products were sold in conformity with the law cannot be a "proximate" or "legal cause" of the harms in this case.

Moreover, a superseding cause breaks the chain of causation and a defendant's actions are not considered a proximate cause of a plaintiff's injuries when a later and unforeseeable event of independent origin actually causes said injuries.  See Exxon Co., U.S.A. v. Sofec, Inc., 517 U.S. 830 (1996); Ames v. Dipietro-Kay Corp., 617 A.2d 559 (1992).  The later unforeseeable event essentially severs the chain of liability for the original actor.  Id.  The intervening criminal act of a third party is a superseding cause which breaks the chain of proximate causation where the original wrongdoer reasonably could not have foreseen such act.  See Estados Unidos Mexicanos v. Smith & Wesson Brands, Inc., 91 F.4th 511, 535 (1st Cir. 2024) ("an intervening crime is superseding cause unless the actor at the time of his negligent conduct realized or should have realized the likelihood ... that a third person might avail himself of the opportunity to commit such a . . . crime").

For example, in <u>Cowart v. Kmart Corp.</u>, Plaintiff, the survivor of a decedent in a shooting incident, brought a wrongful death action against Defendant Kmart who sold ammunition to a seventeen (17) year old minor ("Carrasco"). 20 S.W.3d 779, 782 (Tex. App. 2000). The ammunition was then used to shoot and kill Plaintiff's decedent by a third-party shooter ("Bell"). <u>Id.</u> In granting summary judgment, the court concluded that Bell's conduct was a superseding cause of decedent's death. <u>See id.</u> at 784. In finding so, the Court held that Kmart could not foresee that its sale of ammunition to a minor would result in the later negligent or intentional misuse of the ammunition for a criminal purpose. <u>Id.</u> at 786.

Here, the intentional and criminal conduct by Delgado breaks any causal connection between MDX's conduct and Mr. Cluney's death. The facts alleged in the Complaint establish that MDX's unfinished frame was sold in conformity with all applicable laws. However, Delgado unlawfully and intentionally utilized the unfinished frame to build a functioning handgun and criminally shot Mr. Cluney. Indeed, similar to <u>Cowart</u>, it is unforeseeable that MDX's sale would result in in the later criminal shooting. Thus, Delgado's unilateral, criminal, and intentional actions are the sole proximate cause of Mr. Cluney's death.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the Plaintiff's Complaint in its entirety.

Dated at Portland, Maine, this 8th day of July, 2024.

Respectfully Submitted,

*/s/ Sigmund D. Schutz*
Sigmund D. Schutz, Esq.
Preti Flaherty LLP
P.O. Box 9546
Portland, Maine 04112-9546
(207) 791-3000
sschutz@preti.com

*Attorney for MDX Corp.*